## VICTOR TALKING MACH. CO. v. KEMENY.

(Circuit Court of Appeals, Third Circuit.    March 4, 1921.)

No. 2602.

1. **Monopolies ⊚⇒17(1)—Contracts fixing prices for resale of article unlawful.**
   An attempt by the manufacturer of a patented article, by means of a system of so-called license contracts, which wholesale and retail dealers were required to sign, to control the resale price of such article after it had sold and received payment for the same, and after such article, under the law as settled by prior decisions of the Supreme Court, by reason of such sales, had been freed from the patent monopoly, *held* an unlawful restraint of trade, in violation of Anti-Trust Act, § 1 (Comp. St. § 8820).

2. **Monopolies ⊚⇒17(2)—Combination to prevent dealer from obtaining goods unlawful.**
   An agreement or combination between the manufacturer of certain articles and the wholesalers or distributors handling the same not to

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

sell any of such articles to a retail dealer *held* unlawful as a restraint of trade in violation of Anti-Trust Act, § 1 (Comp. St. § 8820).

**3. Monopolies ⊙⟹28—Profits cannot be measured by those made under illegal contract.**

Damages for loss of profits by a retail dealer in certain articles, resulting from an illegal combination between the manufacturer and wholesale dealers in such articles, which prevented him from obtaining the same, cannot be measured by his profits from their sale at prices fixed by the manufacturer under a previous contract which was unlawful.

In Error to the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

Action at law by Louis Kemeny against the Victor Talking Machine Company. Judgment for plaintiff, and defendant brings error. Affirmed, on condition of filing of remittitur by plaintiff.

James M. Beck and Frank L. Crawford, both of New York City, John D. Myers, of Camden, N. J., William H. Griffin, of New York City, and Louis B. Le Duc, of Camden, N. J., for plaintiff in error.

Joseph E. Stricker, of Perth Amboy, N. J., and Frederick M. P. Pearse, of Newark, N. J., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. Louis Kemeny brought this action against Victor Talking Machine Company to recover damages, treble in amount, for injury done his business in violation of the Sherman Anti-Trust Law (Comp. St. §§ 8820-8823, 8827-8833). Before determining what were the issues in the case and whether in their trial error was committed, we shall state the course of the defendant's business out of which the controversy arose and review very briefly some decisions which bear on its lawfulness.

Speaking of the parties as they stood in the court below, the defendant is a manufacturer of talking machines and accessories made and sold under many patents. It marketed its products primarily through wholesalers, who were called "Distributors," and secondarily, through "Retail Dealers," who secured the products from the distributors. The plaintiff had been a retail dealer.

With members of each of these classes of dealers the defendant had separate contracts called "License Contracts" and in addition it affixed a notice, called a "License Notice," to each of its products. By the license contract with distributors the defendant disposed of its wares to them upon payment in full of list prices, with certain stipulated restrictions, among which was one that they should sell only to licensed dealers and then only at named prices.

The license contract with dealers provided for the purchase of the defendant's wares only from licensed distributors, similarly restricting them with reference both to purchase prices and resale prices.

The license notice which the defendant affixed to a machine before it started to the public through the channels of so-called licensed distributors and licensed dealers declared that the machine was manufactured

under patents and was licensed in the hands of the ultimate purchaser for the term of that patent having the longest time to run and was to be used only with accessories manufactured by the defendant; that the distributor's only right to use the machine was for demonstrating purposes, assignable to retail dealers and the public; that the right which the ultimate purchaser should have in the machine was only the right to use it; that the title thereto shall remain in the defendant with a right to repossess it upon breach of any of the conditions of the notice; and that "any excess use, or violation of the conditions, will be an infringement of the said patents." Straus v. Victor Talking Machine Company, 243 U. S. 490, 494, 495, 37 Sup. Ct. 412, 413 (61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955).

The defendant had outstanding several hundred license contracts with distributors, many thousand with retail dealers, and innumerable license notices. It is not seriously denied that the defendant's purpose in formulating and putting into effect this method of doing business was the fixation of selling prices of Victor products from distributor to dealer and from dealer to the public under the defendant's conception of the monopoly created and awarded it under the patent law. But as later determined, the defendant's conception of its rights and its belief in the legality of its conduct were, all the while, wrong.

The main fact on which the law touching the validity of the defendant's conduct turned was the transaction by which the defendant initially disposed of its products to licensed distributors. However termed, these contracts were and subsequently have been held to be contracts of sale, and on payment of the contract price and delivery of the machine paid for, the distributor, and, later on, the retail dealer, became a purchaser and thereafter was entitled to dispose of it as his own. The question which ran through the cases involving similar transactions concerned the right of the seller to follow the patented commodity (sold through a primary purchaser and in some instances through a secondary purchaser) to the ultimate purchaser and to control its price at all times.

The first pronouncement by the Supreme Court bearing on the subject, of which we are informed, was made in 1873 in the case of Adams v. Burke, 17 Wall. 453, 21 L. Ed. 700. There it was said:

"The right to manufacture, the right to sell, and the right to use are each substantive rights, and may be granted or conferred separately by the patentee.

"But, in the essential nature of things, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use. The article, in the language of the court, passes without the limit of the monopoly. That is to say, the patentee or his assignee having in the act of sale received all the royalty or consideration which he claims for the use of his invention in that particular machine or instrument, it is open to the use of the purchaser without further restriction on account of the monopoly of the patentees."

With one exception, the Supreme Court has consistently followed this rule of the patent law.

The next case in point of time and importance was Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, decided in 1911. There the manufacturer of proprietary medicines, to prevent their sale at cut prices, undertook to govern directly the entire trade in the medicines of its make. To do this it adopted two forms of restrictive agreements limiting trade in the articles to those who became parties to one or the other. With marked resemblance to the defendant's contracts, one sort of contract was known as "Consignment Contract—Wholesale," having been made with several hundred wholesale dealers; and the other described as "Retail Agency Contract," having been made with many thousand retail dealers. One issue turned on the character of the consignment contract, it being contended that it contemplated "a true consignment for sale for account of the complainant." The trial court however regarded the contract merely as an effort "to disguise the wholesale dealers in the mask of agency" and held that the purchaser acted in his own capacity, and that the transaction was one of sale. Being of the same opinion the Supreme Court held that the contract in effect eliminated all competition, established the amount which the consumer should pay and therefore constituted a restraint of trade, violative of the Sherman Anti-Trust Act.

Then came Henry v. Dick Company, 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880, sustaining the claimed right of a patentee to follow the patented machine into the hands of a purchaser and to restrict its use except in connection with prescribed unpatented articles. While confusion may have arisen from this decision and from the fact that subsequently it was overruled, its pertinency to this case bears mainly on the license notice attached to the machine, and on that part of the license contracts which permitted the use of the machines only in connection with other Victor products. The decision did not sanction the features of the defendant's contracts by which it sought to restrain competition and regulate the sale prices of its commodities as they passed from distributing purchaser to ultimate consumer.

The defendant in the instant case insists, however, that the main terms of the offending contracts were framed after the pronouncement and on authority of the law of Henry v. Dick. But it happened that before these contracts went into effect the case of Bauer & Cie. v. O'Donnell, 229 U. S. 1, 33, Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. R. (N. S.) 1185, Ann. Cas. 1915A, 150, was decided. In that case also the patentee sought to follow the patented article into the hands of the public, and, by "Notice to Retailer" on each package, to impose a condition as to price, violation of which it regarded as infringement. The Supreme Court distinguished that case from Henry v. Dick, and, quoting from Adams v. Burke the rule to which we have adverted, held:

"A patentee may not by notice limit the price at which future retail sales of the patented article may be made, such article being in the hands of a retailer *by purchase* from a jobber who *has paid* to the agent of the patentee the full price asked for the article sold."

The decision in Bauer v. O'Donnell was rendered in May, 1913. It was in August following (and more than a year after the decision in

Henry v. Dick) that the defendant, with the law of Bauer v. O'Donnell before it, framed and put into effect the license agreements in dispute.

On April 9, 1917, the Supreme Court handed down a decision in Straus v. Victor Talking Machine Co., 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955, reversing Victor Talking Machine Co. v. Strauss, 230 Fed. 449, 144 C. C. A. 591.

This action was brought by Victor Talking Machine Company, the present defendant, against Straus and others for infringement of its patents in acquiring Victor products from sources other than licensed dealers and disposing of them ·to the public contrary to the conditions of the attached license notices. In the prosecution of this suit, the Victor Company set forth in its bill of complaint its entire scheme of operation. The plaintiff in the case at bar availed himself of the bill of complaint in that suit by introducing it in evidence against the defendant here in proof of its business conduct. The trial court in Victor Talking Machine Co. v. Strauss referred to the case as presenting—

"the familiar one of the manufacturer of a patented article undertaking to extend its use and at the same time regulate the terms and conditions under which it shall be used. It seeks to accomplish this in part by a written contract entered into between itself and every so-called licensed dealer to whom it delivers the possession of instruments or records. This need not be recited, as in substance it is the same as a so-called 'license notice' which is attached to a conspicuous part of every machine."

The notice, embodying the substance of the contracts, was then given in full.

The defendant insists that the decision on appeal in Straus v. Victor Talking Machine Company, being an action of infringement relating solely to the validity under the patent law of the license notice, has no bearing on the instant case where the license contracts, it alleges, are involved as violative of the Anti-Trust Law. We think however that Straus v. Victor Talking Machine Co., as decided by the Supreme Court, has a bearing on some aspects of the case before us.

After reciting the several license contracts and the license notice resorted to by the defendant further to control its patented products in the hands of the ultimate purchaser, the Supreme Court said:

"First of all it is plainly apparent that this plan of marketing adopted by the plaintiff is, in substance, the one dealt with by this court in Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, and in Bauer v. O'Donnell, 229 U. S. 1, adroitly modified on the one hand to take advantage, if possible, of distinctions suggested by these decisions, and on the other hand to evade certain supposed effects of them."

In the conclusion of the opinion, holding that the monopoly of use granted by the patent law cannot be made a means of controlling the prices of patented articles after they have been in reality, even though not in form, sold and paid for, the court rested its decision on Adams v. Burke and Bauer v. O'Donnell, which seemingly it regarded always to have been the law, by saying:

"Convinced as we are that the purpose and effect of this 'License Notice' of plaintiff, considered as a part of its scheme for marketing its product, is not to secure to the plaintiff any use of its machines, and as is contemplated by the patent statutes, but that its real and poorly-concealed purpose is to re-

strict the price of them, after the plaintiff had been paid for them and after they have passed into the possession of dealers and of the public, we conclude that it falls within the principles of Adams v. Burke, 17 Wall. 453, 456, and of Bauer v. O'Donnell, 229 U. S. 1; that it is, therefore, invalid."

On the day of its decision in Straus v. Victor Talking Machine Co., the Supreme Court decided Motion Picture Patents Co. v. Universal Film Co., 243 U. S. 502, 37 Sup. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959, overruling Henry v. Dick, 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880.

Later, the case of Boston Store of Chicago v. American Graphophone Co., 246 U. S. 8, 38 Sup. Ct. 257, 62 L. Ed. 551, Ann. Cas. 1918C, 447, involving a price-fixing contract under the patent law was decided. In that case the Chief Justice, speaking for the court, gave its interpretation of its previous decision in Straus v. Victor Talking Machine Co. as follows:

"The right to fix a permanent marketing price at which phonographs should be resold *after they had been sold by the patentee* was considered. Basing its action upon the substance of things, and disregarding mere forms of expression as to license, etc., the court held that the contract was obviously in substance like the one considered in the Miles Medical Case and *not different from the one which had come under review in Bauer v. O'Donnell.* Thus brushing away disguises resulting from forms of expression in the contract, and considering it in the light of the patent law, it was held that the attempt to regulate the future price or the future marketing of the patented article was not within the monopoly granted by the patent law, in accordance with the rule laid down in Bauer v. O'Donnell."

Also in reviewing its decision in Motion Picture Patents Co. v. Universal Film Manufacturing Co., supra, the court gave its construction of that case by saying:

"It required once again a consideration of the doctrine which had been previously announced in Henry v. Dick Co. and of the significance of the monopoly of the right to use, conferred by the patent law, which had been reserved in Bauer v. O'Donnell. Comprehensively reviewing the subject, it was decided that the rulings in Bauer v. O'Donnell and Straus v. Victor Talking Machine Co. conflicted with the doctrine announced and the rights sustained in Henry v. Dick Co., and that case was consequently overruled. Reiterating the ruling in the two last cases, it was again decided that, as by virtue of the patent law, one who had sold a patented machine and received the price, and had thus placed the machine so sold beyond the confines of the patent law, could not, by qualifying restrictions as to use, keep under the patent monopoly a subject to which the monopoly no longer applied."

Thus the court again held to the rule of Adams v. Burke, supra, as followed through Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 28 Sup. Ct. 722, 52 L. Ed. 1086; Dr. Miles Medical Co. v. Park & Sons Co., supra; Bauer v. O'Donnell, supra.

[1] We have reviewed the decisions at this length in order to make it clear that the business arrangement by which the defendant marketed its products, involving a sale to so-called licensed distributors with restrictions on their use and resale price, was unlawful; and also in order to meet the defendant's contention that even if the arrangement were unlawful it was justified under the authority of the Supreme Court and that such arrangement did not become culpably unlawful until that court changed the law by overruling its previous decision and established

with finality that where a patentee sells his product he exhausts his monopoly right. This law we regard as having been established by the Supreme Court as early as Adams v. Burke (1873). If disturbed by the decision in Henry v. Dick, the rule of Adams v. Burke was later reaffirmed in Bauer v. O'Donnell, at a time before the contracts in question were put into force. The defendant's marketing arrangement was therefore unlawful.

· Coming to the facts, this case was tried and on this writ of error it was argued on wholly opposite conceptions of the issues involved. Whether error was committed in the trial depends accordingly on the question whether the learned judge tried the case on the right issues. If he did not, there was fundamental error; if he did, then error, if any, was only incidental. Therefore we must first find what were the issues,—that is, what was the case about?

The plaintiff had for several years been a licensed retail dealer under the usual form of the defendant's license contracts for the sale of Victor products. His contract required him to purchase from a licensed distributor and to sell to the public only at list prices. He violated his contract by buying from a licensed distributor at less than list prices and selling to the public at cut prices. On discovering this, the defendant informed the plaintiff that he could no longer purchase Victor products either from the Company direct or from its distributors, and on March 19, 1917, cancelled the contract. Thereafter the plaintiff brought this suit for conduct of the defendant destructive of his business and violative of the Sherman Anti-Trust Law. The defendant tried the case on the theory that—using the language of its brief—"the actionable wrong of which Kemeny complains was committed on March 19, 1917, when he was suspended as a retail dealer and as such cut off from his supply of Victor goods." On this conception of the issue, the defendant made several defenses:

First, that under the terms of the contract, though unlawful, the defendant had a right to cancel it. As no one questioned this right, it figured little in the case.

Second, that the arrangement, involving license contracts and license notices, by which the defendant sought to retain price control of its patented products throughout the terms of the patents, was valid; or, if not, it was justified under Henry v. Dick until the law in that case was overruled twenty-one days following the date of the cancellation of the contract. Having already passed upon the last two contentions, we go to the next, which is:

Third, that assuming the business system or combination established by the defendant for the sale of its products was in violation of the Sherman Anti-Trust Law, the plaintiff, having been a part of the system or combination and thereby having participated in the violation of the law, cannot be heard to complain of injury to his business resulting therefrom. If we were to find as the defendant assumes that the cause of action is based on conduct involved under the contract of license with the plaintiff, concluding with its cancellation, we should not hesitate to hold that the plaintiff was as guilty as the defendant in violating

the law, and that the principle on which Bluefields Steamship Co., Limited, v. United Fruit Co., 243 Fed. 1, 155 C. C. A. 531, was decided would apply to him and preclude recovery. In pari delicto potior est conditio defendentis.

Fourth, if the conduct which the defendant considers to be the substance of the plaintiff's complaint consisted merely in requests by the defendant to its distributors, even though they were vendees, to adhere to list prices, and in its refusal to sell to those who would not so promise, we should take the defendant's view and regard the law of United States v. Colgate, 250 U. S. 300, 39 Sup. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443, as applicable. But the law of that case,—which in United States v. Schrader, 252 U. S. 85, 99, 40 Sup. Ct. 251, 64 L. Ed. 471, was clearly shown not to overrule or modify that of Dr. Miles Medical Co. v. Park & Sons Co.,—applied to a situation where the defendant was not charged to have made "agreements" which limited the future use of commodities sold and which bound vendees to observe specified resale prices. There was in that case no evidence of a purpose to maintain a monopoly and restrain trade by means of restrictive agreements. In a word, all that was done by the decision in the Colgate Case, as we read the opinion, was to preserve a producer's right of freedom to trade— lawfully. It has been decided that the defendant's method of trade was unlawful.

The plaintiff's theory of the wrong done him by the defendant, and of the issues of the case as pleaded (and later proved), were directly the opposite of those entertained by the defendant. In his bill of complaint, he recited the course of the defendant's business; averred that, in February, 1917, the defendant informed him that he could get no more Victor products, and, at or about the same time, forbade its distributors and dealers to sell products to the plaintiff under penalty of having their own supply cut off. Having later proved the cancellation of the contract as of March 19, 1917, the plaintiff further averred in his bill:

"That since April 9, 1917 (the date of the decision by the Supreme Court of Straus v. Victor Talking Machine Company and Motion Picture Patents Co. v. Universal Film Mfg. Co.), and for no good reason or cause whatever, the defendant by its agents, officers and distributors has refused to sell to the plaintiff any of the Victor articles," etc.

charged that these acts of the defendant "were and are for the purpose of restraining trade, preventing competition and controlling and maintaining prices contrary to" Federal statutes; and alleged damage to his business in an amount named. It thus appears that the issues of this case as regarded by the defendant involved its conduct at and before the cancellation of the contract; and that the issues as pleaded, and later proved, by the plaintiff concerned conduct of the defendant after the cancellation of the contract. This distinction the learned trial judge grasped at the very beginning of the trial and to it he firmly held throughout the trial in all his rulings on evidence and instructions on the law.

271 F.—52

[2] Paraphrasing the opinion, he told the jury, that the agreements were sales agreements which entitled the plaintiff on paying for and receiving goods to dispose of them as he saw fit; that the agreements were unlawful; that, when acting under them, both the plaintiff and defendant were alike guilty of violating the law; and that for an injury arising out of their mutual conduct neither one could obtain legal redress against the other. Continuing he said:

"However, the cause of action is not founded on those agreements; it is based on something which the plaintiff alleges took place after the agreements were terminated, which the defendant did, as it had a right to do, on March 19, 1917,"

instructing the jury specifically that, if the defendant did nothing more than cancel the agreement, there would have been no cause of action, but directing their attention to evidence that, in addition to cancelling the dealer's agreement, the defendant entered into a combination, or agreement, or conspiracy, or some kind of an understanding with its distributors that they should not sell to the plaintiff any of its goods nor fill any of the plaintiff's orders previously placed. Continuing the court said to the jury: If that is proven, the plaintiff has made out a cause of action, noting that it makes very little difference what may have transpired before March 19, 1917. That the cause of action is the understanding of the defendant with one or more of its distributors, seeking to prevent and actually preventing the defendant from getting goods. "If that has been proven in the case, there is a cause of action; if that has not been proven in the case, that is an end to the inquiry and you dismiss everything else from your minds and find a verdict for the defendant."

We think the learned trial judge found the true issue in the case and stated it with admirable clarity.

Evidence of the defendant's acts after the cancellation of the contract, whereby it induced distributors and dealers from filling the plaintiff's orders already given and thereafter from selling him Victor products which such distributors had purchased and which they owned and were free to sell under the construction given the license agreements and license notices, was introduced, and was sufficient, we think, to sustain the finding by the verdict that they were violative of the Sherman Anti-Trust Law and also to sustain the finding of damage to the plaintiff—if the court's instructions on the measure of damages were proper.

The damages which the plaintiff claimed he had sustained by reason of the defendant's unlawful acts were of two kinds: First, loss of anticipated profits, and second, loss in disposing of his stock in hand when shut off from obtaining more Victor products. The court by separate instructions charged the jury with reference to the measure applicable to damages of each kind.

[3] On the measure of damages for loss of anticipated profits, as charged by the court, the defendant specified three errors, two having to do with instructions requested and refused and one with the instruction given. The instruction which the court gave permitted the jury,

in ascertaining the plaintiff's damages for loss of anticipated profits, to resort to evidence of profits he had made in his business as retail dealer of Victor products when he was a member of the defendant's unlawful business system. The two instructions which the defendant requested were framed along the line of its understanding of the issue as centering on the cancellation of the contract and, when read together, were in substance as follows:

"The plaintiff may not use the earnings or profits which he made out of Victor goods prior to March 19, 1917," "in the course of a violation of law or in a business system which was unlawful," "as a measure of the damages which he claims to have suffered by the interruption of his business on or about that date, because he was a willing party to the system" and participated in its profits.

We are of opinion that the learned trial judge made no error in refusing these instructions as framed, for, if given as requested, they might have mistakenly led the jury to issues of the case, regarded by the defendant as involving its conduct before and at the time of the interruption of the plaintiff's business by the cancellation of the contract. Yet it is possible to construe the "interruption" referred to as occurring by the defendant's conduct after the cancellation of the contract. In any event we are constrained to hold that the learned trial judge fell into error when he permitted the jury to find damages by way of unrealized profits from evidence of profits which the plaintiff had made when engaged with the defendant in an unlawful business. Profits which the plaintiff could anticipate if he had been permitted to go on and sell Victor products were only such as he could earn lawfully in a competitive market. Such profits can not, we think, be ascertained from profits which he had earned under a system whose sole purpose was to maintain prices, restrict competition, and create monopoly.

As to the measure of the plaintiff's second ground of damages, arising from the sale of his stock under the forced disadvantage of being unable to round it out by the purchase of more goods, the defendant made no request for instructions except under its erroneous theory of the action; and with reference to this element of damages assigned no error in the instruction which the court gave.

If, however, any one of the many assignments of error can be construed as bearing on this second ground of damages, we hold after careful consideration that the court's instruction with reference to it was not affected by error.

On the two instructions as to damages—loss of anticipated profits and loss incident to sale of stock on hand—the court submitted the case and the jury rendered a verdict for the plaintiff (first trebling damages) in the amount of $2,000.00. If that were all the jury did, it would manifestly be impossible for this court to find on what evidence the jury based its verdict—whether on that relating to loss of profits or on that concerning loss on sale of stock—and there being error in the instruction with reference to the first, the judgment would have to be reversed and the case retried. But the jury, following carefully the separate instructions of the court on the two kinds of damages, did a quite un-

usual thing. It showed how it made up its verdict for the plaintiff for $2,000.00 by rendering the verdict in the following form:

```
"Allowance for profits lost (trebled) ....................$1,000.00
 Allowance for damages (trebled) .....................$1,000.00
                                                       ─────────
 Making a total of ........................................$2,000.00"
```

As the jury distinguished between the two elements of damages by returning a separate finding upon each, we can readily separate the finding in which error was involved from the one which was free from error. And this we do. Therefore we affirm the judgment, provided, however, the plaintiff file a remittitur for $1,000.00, the amount found by the verdict "for profits lost," thus in effect leaving the judgment stand on the verdict "for damages." Otherwise the judgment is reversed and a new trial ordered.