## EASTMAN KODAK CO. v. BLACKMORE.

(Circuit Court of Appeals, Second Circuit. December 14, 1921.)

No. 65.

**1. Monopolies ⬤═23—Retail dealer held not entitled to damages.**

No damage can flow from a lawful business or commercial transaction in which a person or corporation had a right to engage, or from the refusal to sell to a retail dealer where such refusal was, as matter of law, wholly within the power and voluntary choice of the seller.

**2. Monopolies ⬤═21—Retail dealer participating in unlawful system of business held not entitled to recover damages.**

A retail dealer participating in an unlawful system of doing business cannot, in the absence of coercion, recover damages under Sherman Anti-Trust Act, § 7 (Comp. St. § 8829), as amended by Clayton Act, § 4 (Comp. St. § 8835d), permitting recovery by persons injured by violation of anti-trust laws, though he claims that prior injury done in not selling him goods was a continuing injury, and that he had never recuperated from such injury, and that it reflected itself in the amount of business done during the time for which damages were sought.

**3. Courts ⬤═406(2)—Circuit Court of Appeals has no power to dismiss, complaint.**

The Circuit Court of Appeals in a proceeding in error has no power to dismiss the complaint, but can only order a new trial.

**4. Monopolies ⬤═28—Profits made in illegal business during certain period not standard upon which to compare profits of later period.**

In an action by retailer under Sherman Anti-Trust Act, § 7 (Comp. St. § 8829), as amended by Clayton Act, § 4 (Comp. St. § 8835d), to recover damages occasioned by a violation of anti-trust laws resulting in decreased profits after the year 1908, based on defendant's refusal to sell goods to plaintiff from 1902 to 1905, profits made by plaintiff and defendant while engaged in an illegal restrictive system from 1899 to 1902 could not be set up as a standard with which to compare the profits of the period after 1908.

**5. Monopolies ⬤═28—Profits during one period held no standard for comparison for lost profits in another period, and damages sought too remote.**

In an action under the Sherman Anti-Trust Act, § 7 (Comp. St. § 8829), as amended by the Clayton Act, § 4 (Comp. St. § 8835d), to recover damages for profits lost after the year 1908, arising out of injury done by refusal of defendant to sell goods to plaintiff between 1902 and 1905, profits made by plaintiff from 1899 to 1902, and from 1905 to 1913, at which time plaintiff was in pari delicto, would furnish no standard of comparison, and damages would be too remote and speculative.

**6. Monopolies ⬤═21—One participating in violation of anti-trust law not entitled to recover from co-conspirator by reason of small part taken.**

A retail dealer who participated in a conspiracy under the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), and benefited thereby is not entitled to recover damages under section 7 of such act (Comp. St. § 8829) by reason of certain acts of the defendant which he did not initiate, but from which he received benefits, since all participants in a conspiracy are conspirators, whether the part they play is great or small.

In Error to the District Court of the United States for the Southern District of New York.

Action by J. Edward Blackmore against the Eastman Kodak Company. Judgment for plaintiff, and defendant brings error. Reversed.

Writ of error to the District Court for the Southern District of New York to review a judgment for $25,127.30 in favor of defendant in error (hereinafter called plaintiff) against plaintiff in error (hereinafter called defendant).

The action was brought to recover damages under section 7 of the so-called Sherman Anti-Trust Act (Comp. St. § 8829), which now, as amended by the Clayton Act, reads as follows: "Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." Act Oct. 15, 1914, c. 323, § 4, 38 Stat. 731 (Comp. St. § 8835d).

The record is voluminous but the facts may be stated with comparative brevity in view of the grounds upon which decision is based.

The amended complaint alleged and the evidence showed without dispute that defendant had violated the provisions of the so-called Anti-Trust Act of July 2, 1890. On January 20, 1916, the United States District Court for the Western District of New York entered its decree in a suit brought by the United States adjudging that defendant and others had "combined, conspired, and participated in various transactions directly affecting" interstate commerce "in photographic supplies * * * with the purpose and intent of unduly and unreasonably suppressing competition and restraining and monopolizing such trade in violation of the act of July 2, 1890." (D. C.) 230 Fed. 522.

The decree further adjudged that defendant, among other things, had monopolized between 75 and 80 per cent. of such trade, and accordingly had attained and held an illegal monopoly thereof, and that such monopoly was induced "by wrongful contracts with regard to raw paper stock, by preventing the trade from obtaining such stock, by acquiring competing plants, business, and stockhouses, dismantling acquired plants, and restraining the vendors from re-entering the business, by imposing on photographic dealers arbitrary and oppressive terms of sale and other regulations inconsistent with fair and free dealing and arbitrarily enforcing the same through the establishment of a system of espionage and the keeping of records of violations with a view of penalizing dealers, by limiting the number of dealers, and in general by suppressing competition by the foregoing and other means."

Later, in the same year of 1916, plaintiff brought this action, and his amended complaint was verified December 30, 1916. The cause came on for trial and resulted in a verdict in plaintiff's favor for $5,000. After this amount had been trebled and $10,000 had been allowed for attorney's fee, under the provisions of section 7, supra, judgment was entered for the amount above stated.

As early as 1894 plaintiff became a regular customer of defendant. From that time until and including July, 1914, he was continuously engaged, under various trade names, at Newark, N. J., in the business of selling photographic and art supplies and of enlarging, printing, and developing photographs.

Down to November, 1911, as to goods manufactured under secret processes, and down to June, 1913, as to goods covered by letters patent, defendant carried on its business under restricted contracts known as "terms of sale," according to which the goods could be resold only at prices fixed by defendant, while the customer also agreed not to handle goods which competed with those sold to him by defendant.

In June, 1913, defendant finally and completely abandoned the restrictive system, and since that date it is undisputed that the goods manufactured and sold by the defendant have been sold free of any restrictions whatever. The changes in the policy of defendant's methods of doing business were practically coincident with the decisions of the Supreme Court of the United States in Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, decided April 3, 1911, and Bauer & Cie. v.

O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150, decided May 26, 1913.

As early as January 6, 1897, or in any event December 2, 1897, plaintiff agreed actively to participate in and took the advantages of defendant's restrictive sales system and of the contracts and agreements in furtherance thereof. This sales system impaired free competition in certain goods in which defendant dealt and was designed to keep up the prices at which the retail dealers with whom defendant dealt directly could and would in turn sell to the buying public.

In 1899 defendant suspended plaintiff from its list of customers but on plaintiff's urgent application and request this suspension was lifted, and in September, 1899 (Plaintiff's Exhibit 23A), plaintiff agreed to maintain prices and comply with other regulations of defendant, and on October 2, 1899 (Plaintiff's Exhibit 23), plaintiff signed a contract with defendant agreeing not to handle photographic papers other than those manufactured by the General Aristo Company, which was one of defendant's associated companies. On November 6, 1899, plaintiff was reinstated as one of defendant's dealers under a notification that the restrictive policy would be maintained as theretofore. From October, 1899, until April 24, 1902, plaintiff was active in reporting to defendant alleged violations by other dealers of defendant's "terms of sale," and these reports involved espionage on the part of plaintiff.

By reason of the refusal of plaintiff to cease handling certain competitive goods in violation of the terms of sale, defendant refused to allow plaintiff the conditional credits allowed for compliance with the "terms of sale," and, upon his refusal to pay these deductions, an action was brought by defendant against plaintiff in the New Jersey Supreme Court, which resulted in defendant's favor. Thus in June, 1902, the plaintiff was off defendant's list of customers and did not participate in the restrictive sales system; but after the plaintiff paid the New Jersey judgment he was reinstated on defendant's list in January, 1905, first, however, having disposed of all independent or competitive goods in his hands.

From January, 1905, to and including July, 1914, plaintiff did business with defendant, and defendant sold him goods under restrictive contracts to the extent that the restrictions applied at the various dates. In other words, from January, 1905, until November, 1911, the restrictive features included goods manufactured under secret processes, and until June, 1913, goods covered by letters patent.

On November 15, 1911, defendant addressed a circular letter "To the Trade" (Defendant's Exhibit 18) explaining the Supreme Court decision and stating the following: "We consider this an opportune time to obtain an expression from the trade as to the desirability, from its standpoint, of our continuing our price restriction and exclusive sale policy so far as patented goods are concerned. We are therefore inclosing herewith a post card which we ask that you use in recording your view of the matter. If, as a result of the vote of the trade, we do not find a strong sentiment in favor of a maintenance of these restrictions on patented goods, we shall remove them without delay."

The postal card inclosed was on a printed form with the words "In favor of" and the words "Not in favor of" and blanks for date and signature. Plaintiff signed this card, stating: "We are in favor of a continuance of your price restriction and exclusive sale policy as applied to your patented goods, such as films and kodaks."

From November, 1911, until June, 1913, plaintiff was at liberty to sell secret process goods without restriction and at any price he pleased, and, in respect of the only class of goods in regard to which the restrictive system applied after November 1911—i. e., patented goods—the signed postal card supra is undisputed evidence of plaintiff's active consent that such goods should remain under this restrictive system.

In addition to the foregoing the evidence shows that plaintiff, whenever requested, signed credit memoranda stating, in substance, that plaintiff had complied with all the requirements of defendant's system, and upon signing

such memoranda plaintiff received the benefit of refunds, known as conditional credits. These credit memoranda were not used after January 1, 1908.

The trial court held that plaintiff was barred by the statute of limitations from any recovery prior to October 15, 1908, so that the cause of action, as thus limited, became one for damages from October 15, 1908, to July, 1914.

Under the ruling of the court the damages were to be ascertained by measuring the difference between the actual average net profits which plaintiff claimed to have made between October 15, 1908, and July, 1914, and the average net profits which plaintiff claimed to have made during the period prior to the time when he was excluded from defendant's list of customers in 1902. This period antecedent to 1902 was thus taken as the standard of comparison, and testimony was received as to sales and profits during that period upon the theory that the jury could ascertain as a fact the damages which plaintiff had suffered by the comparison above stated.

In addition to the foregoing, the only acts of any consequence which plaintiff in his pleading or testimony claims, even by inference, have caused him injury were those connected with the acquisition by defendant of various properties consisting either of letters patent or secret processes which carried with them the exclusive right to make and to sell certain goods theretofore made and sold by competitors of defendant or the stock control of certain corporations which were alleged to have been competitors of defendant and the acquisition of which control brought with it the exclusive right to make certain products.

The record is barren of any proof showing specifically any damage which resulted to plaintiff by virtue of these acquisitions, and substantially all of the goods the exclusive right to make which was obtained by defendant in pursuance of its monopolistic effort (except photographic plates) were as soon as acquired added to the "terms of sale," and hence thereafter acquiesced in and agreed to by the plaintiff.

At the end of the plaintiff's case and of the whole case defendant duly moved to dismiss the complaint, and at the end of the case also moved for a directed verdict on the ground, inter alia, that there was no cause of action. These motions were denied. Exceptions were duly taken, and defendant has now brought this writ of error.

Hubbell, Taylor, Goodwin & Moser, of Rochester, N. Y. (Frank L. Crawford, of New York City, and Clarence P. Moser, of Rochester, N. Y., of counsel), for plaintiff in error.

John B. Johnston, of New York City (Terence Farley, Frederick A. Card, and Frank I. Tierney, all of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and MAYER. Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). From the foregoing outline it is apparent that during the period of 1908 to June, 1913, plaintiff acquiesced and actively participated in defendant's so-called restrictive sales system. After June, 1913, the system was abandoned, and therefore from that date until July, 1914, plaintiff was not under restrictions and could deal with defendant, on the one hand, in the free relation of customer with seller, and, on the other, with the public with the privilege and right of selling defendant's goods at such prices as he pleased.

From 1899 until he was dropped by defendant in 1902 plaintiff also acquiesced and actively participated in defendant's restrictive system. During this period he gained such advantages as accrued from the

price-fixing system and from the exclusion of those dealers, who, unlike plaintiff, would not accede to this method of doing business.

The theory of plaintiff is that defendant wrongfully refused to sell goods to plaintiff during the period from 1902 to 1905; that the injury thus done was a continuing injury for which the plaintiff may now recover damages for the period from 1908 to 1914, for the reason that plaintiff never recuperated from the injury done to his business from 1902 to 1905, and that injury reflected itself in the amount of business done by plaintiff from 1908 to 1914, and consequently in the diminution of net profits during that period.

The trial judge held and plaintiff now urges that prior to the decisions in Dr. Miles Medical Co. v. Park & Sons Co., supra, and Bauer & Cie. v. O'Donnell, supra, defendant's restrictive sales system was lawful. This was upon the theory that the Supreme Court had so held and had not held the practice unlawful until it handed down its opinions in the two cases just referred to.

[1] If this premise were to be adopted, it must necessarily follow that, if the business system now complained of was lawful in 1902, then defendant was entirely within its rights and acting lawfully when it refused in 1902 to deal further with plaintiff. In other words, if in 1902 defendant had the right to refuse to sell goods or trade with a person who would not sign or otherwise participate in its "terms of sale" system, then obviously it could choose or exclude customers at will. Upon this theory we think it is plain that no damage can flow from a lawful business or commercial transaction in which a person or corporation had a right to engage or from the refusal to sell to a person where such refusal was, as matter of law, wholly within the power and voluntary choice of the seller or dealer.

[2] If, on the other hand, it be assumed (and we find it unnecessary to decide this point) that defendant's restrictive system was at all times here concerned unlawful, then the question is whether a participant in an unlawful system of doing business can, as matter of law, recover damages while at the same time participating in the unlawful system. As applied to the facts of this case, the question is whether plaintiff, as a participant after 1908, will be permitted to recover damages alleged to have been suffered during that period when during that very period for which he seeks redress he was an active wrongdoer, if defendant was a wrongdoer.

The rule is tersely stated by Gray, J., in Hall v. Corcoran, 107 Mass. 251, 253 (9 Am. Rep. 30) as follows:

"The general principle is undoubted that courts of justice will not assist a person who has participated in a transaction forbidden by statute to assert rights growing out of it, or to relieve himself from the consequences of his own illegal act. Whether the form of the action is in contract or in tort, the test in each case is whether, when all the facts are disclosed, the action appears to be founded in a violation of law, in which the plaintiff has taken part."

In Continental Wall Paper Co. v. Voight & Sons Co., 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486, plaintiff in an action at law sought to recover from defendant in a situation which may be regarded as the converse of that at bar.

"Stated shortly," said Mr. Justice Harlan, "the present case is this:

"The plaintiff comes into court admitting that it is an illegal combination whose operations restrain and monopolize commerce and trade among the states and asks a judgment that will give effect, as far as it goes, to agreements that constituted that combination, and by means of which the combination proposes to accomplish forbidden ends. We hold that such a judgment cannot be granted without departing from the statutory rule, long established in the jurisprudence of both this country and England, that a court will not lend its aid in any way to a party seeking to realize the fruits of an agreement that appears to be tainted with illegality, although the result of applying that rule may sometimes be to shield one who has got something for which as between man and man he ought, perhaps, to pay, but for which he is unwilling to pay.

"In such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties. It is of no consequence that the present defendant company had knowledge of the alleged illegal combination and its plans or was directly or indirectly a party thereto. Its interest must be put out of view altogether when it is sought to have the assistance of the court in accomplishing ends forbidden by the law."

In Bluefield S. S. Co. v. United Fruit Co., 243 Fed. 1, especially at pages 13 et seq. and 19, 155 C. C. A. 531, the court pointed out, in effect, that one who is in pari delicto in cases, such as that at bar, cannot recover, and the same principle is discussed in Victor Talking Mach. Co. v. Kemeny (C. C. A.) 271 Fed. 810, 816. See, also, McMullen v. Hoffman, 174 U. S. 639, 654, 19 Sup. Ct. 839, 43 L. Ed. 1117, and Cooley on Torts (3d Ed. 1906) vol. 1, pp. 254–261. Further citation is unnecessary because of the many cases cited in the cases referred to supra.

The proposition of plaintiff, in effect, is that, while he joined with defendant in the illegal method of doing business after 1908 and took such advantages as sprang therefrom, he may nevertheless recover damages caused, as he claims, during the period when he and defendant were both wrongdoers. With this proposition we are unable to agree.

[3, 4] As we have no power to dismiss the complaint, and a new trial must be ordered, in accordance with Slocum v. New York Life Ins. Co., 228 U. S. 364, 33 Sup. Ct. 523, 57 L. Ed. 879, Ann. Cas. 1914D, 1029, it may be well to call attention to another question presented upon this review. If plaintiff and defendant were engaged in an illegal restrictive system from 1899 to 1902, obviously that period cannot be set up as a standard with which to compare the profits of the period after 1908. It is necessary upon this point to refer merely to what was said in Victor Talking Machine Co. v. Kemeny, supra, at pages 818 and 819.

If, on the other hand, the business from 1899 to 1902 be deemed lawful, then the question of a standard of comparison does not arise, because, as above pointed out, upon that hypothesis, the refusal of defendant to do business with plaintiff from 1902 to 1905 was lawful.

[5] There was no evidence of coercion in its legal acceptation, and thus the evidence was complete that plaintiff was in pari delicto, if defendant's business from 1899 to 1902 and from 1905 to June, 1913, be regarded as unlawful. From June, 1913, to July, 1914, there were

concededly no restrictions upon plaintiff, and therefore defendant's business so far as concerned plaintiff was lawful, but for that period plaintiff could not have recovered upon any theory that his net profits were decreased as the result of the suspension from 1902 to 1905 for the reason: First, that there is no standard of comparison; and, secondly, that, in any event, the damages would have been too remote and speculative. Central Coal & Coke Co. v. Hartman, 111 Fed. 96, 98, 99, 49 C. C. A. 244.

The views as to the law of coercion and participation in wrongful acts expressed supra were no different, in substance, than those stated by the learned trial judge, but the point of departure is illustrated by the following excerpt from his charge. After explaining, in effect, that defendant had not coerced plaintiff, in the legal sense of that term, and after charging as to the legal effect of the voluntary participation of plaintiff in the restrictive sales system, the judge, as indicating the view entertained by him during the trial, continued:

"The law, as I say, is that so far as you may find that Mr. Blackmore consented to the terms of sale covering such of the articles as you may believe he did consent to, if any, then he cannot recover any damages by reason of any loss he may have suffered from the imposition of those terms of sale as to such articles.

"Now, of course, this, as I have said, does not apply to acts other than the terms of sale; for there is no contention that Mr. Blackmore consented to anything if he consented to anything at all except the terms of sale. If there were other acts that caused him injury than those represented by the terms of sale, then these matters that I have spoken of with reference to consent have no application to such matters, because his consent is limited to the system represented by the terms of sale, and, if he suffered damage from any acts of the defendant other than the terms of sale, the question of consent would have no application."

The only "other acts" which need be considered are those which consisted in the acquisition by defendant of letters patent, secret processes, and stock control of other corporations carrying the exclusive right to make certain products. The record contains a long list of articles added from time to time to the "terms of sale" by virtue of these acquisitions. Certain photographic plates (Seed, standard, and dry plates) were not included in the regular terms of sale, but some of them appear on a discount sheet dated April 1, 1906, which set forth certain restrictions as to price. The plaintiff, however, accepted discounts on these plates under the terms mentioned in the discount sheet.

In brief, assuming that what defendant did in conjunction with others amounted to a conspiracy under the act, and that defendant succeeded in obtaining a monopoly contrary to the act, plaintiff at all times derived the advantages and accepted the benefits which flowed from that conspiracy and that monopoly.

[6] It is fundamental that in the same conspiracy all participants are conspirators, whether the part they play be great or small. They cannot receive some of the fruits and then be held blameless for other acts which they may not have initiated but whose benefits they have received. On the evidence in this case, we are unable to find any act of defendant or of plaintiff which, as matter of law, separates them

from each other as participants in the same conspiracy and which frees plaintiff from being in pari delicto with defendant.

We are of opinion, therefore, that the court should have dismissed the complaint in response to motions duly made.

Judgment reversed.